**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| EVA M. GRABILL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 16-cv-3099 |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>OPINION</u>

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Eva M. Grabill appeals from the Defendant Commissioner of Social Security's final decision on her application for Social Security Disability Insurance Benefits (DIB) under Title II of the Social Security Act and Supplemental Security Income Disability Benefits (SSI) under Title XVI of the Social Security Act.  42 U.S.C. §§ 416(i), 423, 1381a, and 1382c (collectively Disability Benefits).  This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c).  Grabill has filed a Brief in Support of Motion for Summary Judgment (d/e 12), and Defendant Commissioner has filed a Motion for Summary Affirmance (d/e 15).  The parties consented, pursuant to 28 U.S.C. § 636(c), to proceed before this Court.  <u>Consent to the Exercise of Jurisdiction by a United States Magistrate and Reference Order</u>

entered May 4, 2016 (d/e 8). For the reasons set forth below, this Court recommends that the decision of the Commissioner be AFFIRMED.

## STATEMENT OF FACTS

Grabill was born on September 15, 1959.  She secured her GED in 1993.  Grabill previously worked as a secretarial assistant and a telemarketer.  She last worked on January 15, 2012.  Grabill suffers from degenerative disc disease, facet arthritis, status post cervical spinal surgery, bilateral chronic venous insufficiency the lower extremities, chronic obstructive pulmonary disease (COPD), and obesity.  Grabill last met the requirements for insured status for DIB on December 31, 2013 (Date Last Insured).  Certified Transcript of Proceedings before the Social Security Administration (d/e 10) (R.), at 14, 36, 37, 170, 193.  A claimant will be entitled to DIB only if she was disabled before her Date Last Insured.  42 U.S.C. §§ 423(a)(1)(A), (c)(1); 20 C.F.R. § 404.131; Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 348 (7th Cir. 2005); Stevenson v. Chater, 105 F.3d 1151, 1154 (7th Cir.1997).

On February 17, 2012, Grabill saw Dr. Taylor Moore, O.D., for lower back pain.  Grabill weighed 193 pounds and had a Body Mass Index (BMI) of 36.91.  On examination, Grabill had bilateral SI joint tenderness, and negative straight-leg testing.  The remainder of her examination was

normal.  Dr. Moore stated that Grabill could not take NSAID[1] pain relievers because of a previous nephrectomy.[2]  Dr. Moore prescribed Tramadol. R. 371-72.

On March 1, 2012, Grabill saw Dr. Moore again for lower back pain. Grabill reported that she has had chronic back pain for five years.  She reported that the pain had gradually gotten worse.    According to Grabill, the pain was moderate to severe and worse when walking long distances. She said the pain occasionally radiated to her legs bilaterally.  Dr. Moore's examination of Grabill was normal.  Dr. Moore ordered x-rays and prescribed muscle relaxants and NSAIDs.  R. 368-70.

On March 2, 2012, x-rays of Grabill showed degenerative disc disease of the lumbar spine.  R. 358.  On March 16, 2012, x-rays of Grabill showed degenerative disc disease of the cervical spine.  R. 359.

On March 16, 2012, Grabill saw Dr. Moore.  Grabill reported trouble sleeping due to back pain.  At this time, Grabill was 5 feet 1.25 inches tall and weighed 191 pounds, for a BMI of 35.6.  She reported that cyclobenzaprine improved her sleep.  Dr. Moore reviewed the x-rays and

---

[1] NSAID is an acronym for a non-steroidal anti-inflammatory drug which includes over-the-counter medications such as aspirin and ibuprofen, and prescription drugs such as Celebrex and Daypro.
[2] A nephrectomy is a surgical removal of a kidney. Dorland's Illustrated Medical Dictionary (32d ed.2012) (Dorland's'), at 1240.

recommended physical therapy. R. 365-66. Grabill underwent four weeks of physical therapy, three sessions per week. R. 393-420.

On June 13, 2012, Grabill saw Dr. Moore. Dr. Moore noted a positive Hoffmann's sign on the left upper extremity.[3] Dr. Moore assessed cervical radiculopathy and neck pain. R. 360.

On June 28, 2012, Grabill completed a Function Report-Adult form. R. 212-19. Grabill stated that she could not stand for long periods of time and could not lift more than five pounds without severe pain and losing feeling in her hands. She stated that when she woke up, she took her medications and performed exercises learned from physical therapy. She lived with her family. She reported that she prepared the food for the family, but later stated that friends helped her with cooking and cleaning. She said she could not sleep because of the pain. She took care of herself, but had trouble dressing and getting in and out of the bath tub. She indicated she had to sit down from time to time while she cooked. She washed dishes, but had to sit down while washing them. She did not do any yardwork because such activities caused pain in her back and neck. She went shopping once a month for food and household needs. She sewed, but was unable to sew every day like she did in the past. She

---

[3] The test for Hoffmann's sign is performed by nipping the nail of the index, middle, or ring finger. A positive sign indicates increased excitability of a nerve, usually the ulnar nerve. See Dorland's, at 1430, 1712.

spent time daily with friends and attended church regularly. She said she could walk one block before she had to rest for five to ten minutes.  R. 212-19.

On August 27, 2012, state agency physician Dr. C.A. Gotway, M.D., completed a Residual Functional Capacity Assessment of Grabill.  Dr. Gotway opined that Grabill could lift 20 pounds occasionally and 10 pounds frequently, stand and/or walk six hours in an eight-hour workday, and sit six hours in an eight-hour workday; and should avoid concentrated exposure to extreme heat, cold, humidity, fumes, odors, dusts, gases, and poor ventilation.  Dr. Gotway opined that Grabill had no other physical limitations on her functional capacity.  R. 67-69, 92-93.

On September 17, 2012, Grabill saw Dr. Moore.  Dr. Moore noted that Grabill's neck pain was better, but she had worsening intermittent paresthesias[4] of the upper extremities.  On examination, Grabill's motor exam was normal and her pulmonary exam was normal.   R. 424.

On November 6, 2012, Grabill underwent an anterior cervical discectomy and fusion with allograft.  On November 16, 2012, Grabill saw Dr. Moore.  Grabill reported some neck pain and severe muscle spasms after the surgery.  Grabill reported that the paresthesias improved after the

---

[4] Paresthesias is an abnormal sensation typically tingling or a pin prick sensation caused chiefly by pressure on or damage to peripheral nerves.

surgery.  Grabill had an apneic episode under anesthesia.  Grabill also reported chronic fatigue.  Dr. Moore ordered a sleep study.  R. 421.  The sleep study showed COPD and sleep apnea.  R. 433.

On December 1, 2012, Grabill completed another Function Report-Adult form.  R. 243-53.  She lived with her family.  She said others helped her with housework and cooking.  She reported that she took more time to care for herself and dress herself.  She said she helped prepare some meals, but could not prepare all meals by herself.  She stated that she did "light household work" but the work took "all day" because she had to rest often.  She shopped for food once a month.  She said she could not draw or sew anymore because her hands "would lock up."  She reported that she spent time with others daily and went to church weekly.  She opined that she could lift no more than five pounds, walk a block before she needed to rest for ten minutes.  R. 243-48.

On December 21, 2012, Grabill underwent a pulmonary function test.  Grabill had an FEV1 of 1.44 liters, 60% of predicted; FVC of 2.06 liters, 72% of predicted.[5]  Bronchodilator therapy showed significant improvement.  Grabill's FEV1 improved to 1.58 liters and her FVC

---

[5] "FEV1 means force expiratory volume in the first second of a forced expiratory maneuver."  "FVC means forced vital capacity."  20 C.F.R. Part 404, Subpart P, Appendix 1, § 3.00.C.10 & 11.

improved to 2.43 liters.  The test showed moderate obstruction with significant change post-bronchodilator therapy.  R. 460.

On January 3, 2013, x-rays showed stable, satisfactory alignment and appearance of Grabill's surgical fusion of C4-5 and C5-6.  R. 461. Grabill underwent another course of physical therapy.  R. 439-56.

On January 22, 2013, state agency physician Dr. Richard Smith, M.D., completed a Physical Residual Functional Capacity Assessment of Grabill.  Dr. Smith agreed with Dr. Gotway's opinions in his August 2012 assessment.  R. 92-93, 101-02.

On March 12, 2013, Grabill saw Dr. Moore.  Grabill complained of continuing neck pain and, in addition, lower extremity pain.  Grabill reported that she had begun having headaches.  She reported that the therapy helped her.  On examination, Grabill had increased swelling and redness in her lower extremities, but she could ambulate without assistive devices and she could fully bear her weight on both legs.  Grabill's motor and pulmonary examinations were normal.  Dr. Moore continued Grabill's medications and recommended continuing to perform the exercises from physical therapy. R. 435.

On April 12, 2013, Grabill saw Dr. Moore.  Grabill reported left ankle pain and cramps in her lower extremities at night.  Grabill had been

wearing compression stockings. The stockings improved the swelling in her legs. At this visit, Grabill weight 232 pounds 4 ounces and had a BMI of 43.29. Grabill's pulmonary examination was normal. R. 499-500. An ex-ray of the ankle showed soft tissue swelling, but was otherwise negative. R. 466. Dr. Moore told Grabill to continue wearing compression stockings. R. 499.

On May 30, 2013, Grabill saw Dr. Moore for headaches. Grabill reported that she had been having headaches since the neck surgery. Grabill reported, "The headaches were debilitating, and pretty much every morning." R. 496. Dr. Moore prescribed nortriptyline and strongly advised Grabill to increase her activity, decrease caffeine intake and avoid MSG. Dr. Moore also told Grabill to stop taking ibuprofen due to stomach upset. R. 496.

On August 26, 2013, Grabill saw Dr. Anne Degreve, D.O., complaining of numbness and tingling in her arms bilaterally when she leaned on her elbows. She did not have any loss of grip strength and the numbness did not awaken her at night. She had intact sensation to light touch and pinprick. Her pulmonary examination was normal. Dr. Degreve recommended consultation with an orthopedic surgeon. R. 492.

On October 17, 2013, physiatrist Dr. Maria Espejo, M.D., examined Grabill and performed a nerve conduction/EMG study on her upper extremities. On examination, Grabill could ambulate within normal limits, she had normal muscle bulk and tone in her upper extremities, normal sensory and reflex tests in the upper extremities, and negative Hoffmann's, Spurling's, and Phalen's tests bilaterally.[6] The nerve conduction/EMG study showed results were normal. R. 464-65.

On November 22, 2013, Grabill saw Dr. Degreve for chronic back pain. Grabill reported that the pain started at her neck surgery incision and radiated down her back. Grabill reported that the pain made her eyes water. She said that she had tried muscle relaxers, amitriptyline, flexeril, NSAIDs, and Tylenol, and nothing helped. Grabill reported that the pain limited her daily activity. Grabill had no weakness no decreased range of motion, and no decreased sensation. Grabill also could ambulate. R. 490. On examination, Dr. Degreve found full range of motion in all extremities, intact sensation, and negative straight leg testing. Dr. Degreve noted, "Pain out of proportion of exam. Multiple tender points bilat." R. 491. Dr. Degreve changed Grabill's medication to Lyrica and prescribed additional physical therapy. R. 490.

---

[6] Spurling's test is test for radiculopathy. See Dorland's, at 1900. Phalen's test is a test for carpal tunnel syndrome. See Dorland's, at 1896.

On February 3, 2014, Grabill saw Dr. Degreve for back pain. Grabill was having problems getting her insurance to approve the prescription for Lyrica. Dr. Degreve prescribed gabapentin, and told Grabill to increase her activities of daily living as she was able. R. 487. On examination, Grabill had a normal gait and did not use assistive devices to ambulate. Grabill's sensory exam and motor examination were normal.

On March 19, 2014, Grabill saw Dr. Degreve complaining of low back pain when walking, and also swelling feet. The back pain was worse after walking and first thing in the morning. Grabill reported that her strength was fine. On examination, Dr. Degreve ordered x-rays of Grabill's lumbar spine. R. 483. The x-rays showed minimal anterolisthesis at L5-S1 and minimal degenerative disc disease of the lumbar spine. R. 471.

On April 10, 2014, Grabill saw Dr. Degreve for cold symptoms and a rash. Dr. Degreve could hear Grabill wheeze from across the examination room. On examination, Dr. Degreve found diffuse wheezing and basilar rales in Grabill's right lung. Grabill weighed 242 pounds and had a BMI of 45.35 at this examination. Dr. Degreve assessed pneumonia and prescribed azithromycin and prednisone. R. 480-82. On a follow-up examination on April 15, 2014, Dr. Degreve found expiratory wheezes over

the upper lobes of Grabill's lungs bilaterally.  R. 478.  Dr. Degreve ordered a pulmonary function test.

On April 17, 2014, pulmonologist Dr. Najappa Somanna, M.D., performed another pulmonary function test on Grabill.  Her FEV1 was 1.53 liters, 65% of predicted and her FVC was 2.31 liters, 81% of predicted. Grabill showed no improvement after bronchodilator therapy.  Dr. Somanna concluded:

> IMPRESSION:  Patient has moderate obstruction on spirometry with no significant change postbronchodilator therapy.  Lung volumes are normal and the diffusion capacity of the lung for carbon monoxide (DLCO) is mildly impaired.  When compared to the prior lung functions from December of 2012, there has been some improvement in the FVC.

R. 473.

On April 23, 2014, Grabill saw Dr. Degreve for low back pain.  Grabill reported that her medications, including gabapentin and cyclobenzaprine, were not helping.  Grabill reported that she stopped using the cyclobenzaprine because it caused headaches.  Grabill's pulmonary examination was normal.  Grabill's motor exam was normal for her upper and lower extremities.  Dr. Degreve noted bilateral lumbar muscle spasms and restricted range of motion in the lumbar area secondary to pain. R. 476.

<u>THE EVIDENTIARY HEARING</u>

On July 14, 2014, the Administrative Law Judge (ALJ) held an evidentiary hearing in this case.  Grabill appeared in person with her attorney.  Vocational expert Suzanne Hollander also appeared.  R. 29.

Grabill testified that she was separated from her husband.  She lived in a house with four of her five children.  Two of the children were under eighteen years of age.  She secured a GED in 1993.  R. 34-35. Grabill testified that she became disabled on January 15, 2012 when she lost her job as a secretarial assistant.  She missed a week of work due to severe headaches.  R. 34.  She worked as a telemarketer before the secretarial assistant job.  R. 36-38.

Grabill testified that she was unable to work because of pain and lack of feeling in her extremities, "I lose feeling in my hands and in my arms, sometimes even in my legs.  I'm in constant pain.  And sometimes it's so bad I can't even get up."  R. 38.  The pain went from her lower back up to her neck.  She said that sometimes she felt like she was choking.  R. 55. She said that about once a week she could not get out of bed due to the pain.  R. 39.

Grabill said that physical therapy helped a great deal with the pain. She said that since her November 2012 neck surgery she gained so much

weight that the exercises were hard to do. She said her pain medications made her lightheaded. R. 40. She stated that she also became lightheaded when she bent over to pick objects off the floor. R. 41.

Grabill opined that she could lift a maximum of ten pounds, sit for twenty minutes at a time, stand for thirty minutes at a time, and walk for half a block. She said that she could sit for three hours a day and stand for four hours a day. R. 41, 54. She testified that she could stand at the stove or sink for five minutes at a time. She took showers because she could not get into the tub. She said she could stand in the shower for ten minutes and the hot water helped alleviate her pain. She could not reach to put her hair in a ponytail, but she could brush her hair. R. 41-43.

Grabill testified that on bad days, she stayed in bed. She said that she had bad days at least twice a week. R. 54. Grabill also said that she daily walked half a block to the bus stop. She took the bus to her medical appointments. R. 41, 54. Grabill testified that she had difficulty preparing food for meals. She said her hands cramped up if she peeled potatoes. Grabill testified that her daughter washed the dishes. R. 44.

Grabill related that she fell often. She said that during the year preceding the hearing, she fell at least three times a month. She said she spent time with her three grandchildren, but one of her sons or daughters

was always present in case she had a problem.  Grabill testified that she had not gone to church in the last year due to her condition.  R. 44-45.

Grabill said that she still sewed with a sewing machine.  She had to take breaks to get up and move around while sewing.  She made doll clothes for her grandchildren. She said it took her a month to make one doll outfit.  She said sewing took so long because her hands cramped up. She also could not thread the machine because of a lack of coordination. Grabill testified that the doctors did not know why she had problems with her hands.  R. 45-46.

Grabill said that after her November 2012 surgery, her legs and feet started to swell.  She testified that her whole body swelled.  She said that her hands were swollen at the hearing.  She testified that the doctors did not know why she had this swelling.  R. 47.  Grabill said that the swelling was worst below her knees.  She said her legs swelled daily.  She stopped wearing compression stockings because they cut off her circulation.  She said that she wrapped her legs daily due to the swelling.  Her best friend helped her wrap her legs.  She also lay in bed and elevated her legs above her head.   She said that for the last three weeks she elevated her legs for an hour twice a day.  R. 48-49.  She also indicated she elevated her legs

once a day before that.  She started elevating her legs about two months after the November 2012 surgery.  R. 50.

Grabill testified that she had shortness of breath.  She took Symbicort and Spiriva daily and used an albuterol nebulizer three times a day.  Each nebulizer treatment took twenty minutes.  R. 51-52.

Grabill said she had mild sleep apnea.  Due to the sleep apnea, she had to sleep on her side.  Grabill stated that she napped daily and had trouble sleeping at night.  She usually woke up three times a night.  R. 52-53.

Grabill indicated she had headaches regularly.  She said, "By the end of the day, every day I have a slight headache."  She stated that at least twice a week she woke up with a severe headache that kept her in bed all day.  R. 55.

Vocational expert Hollander then testified.  The ALJ asked Hollander the following hypothetical question:

> Let me ask you some hypothetical questions.  And consider a hypothetical individual who could perform light work; occasionally lift 20 pounds, on a regular basis able to lift 10; standing and walking six hours in an eight-hour workday; able to sit two hours in an eight-hour workday with normally allotted work breaks; this individual should avoid concentrated exposure to temperature extremes, humidity, fumes, odors, gases, and poor ventilation.  Would you be able to identify past work was at the sedentary level so I'm not going to ask

about that one, but could you identify any work that could be performed under that hypothetical?

R. 57.  Hollander testified that the person could perform the jobs of

information clerk, with 1,800 such jobs in Illinois and 50,000 nationally;

counter clerk, with 490 such jobs in Illinois and 13,000 nationally; and

storage facility clerk, with 4,000 such jobs in Illinois and 125,000 nationally.

R. 57-58.

The ALJ asked Hollander the following:

Q I want to ask you some additional limitations here. And I'm going to reduce this person to lifting 10 pounds frequently and occasionally; they can sit for 20 minutes at a time and then would need to stand for five minutes at a time, for a total of two hours in an eight-hour workday of standing and walking; and sitting six hours in an eight- hour workday; this individual should also avoid concentrated exposure to temperature extremes, humidity, fumes, odors, gases, and poor ventilation; however, this individual should elevate their legs over their head two times per day, for an hour each time. Would they be able to perform any work you could identify with that limitation?

R. 58.  Hollander opined that such a person could not work.  R. 58.

Hollander also opined that a person could not work if she needed extra

work breaks, including two breaks of an hour a day.  R. 58-59.  Hollander

opined that such a person could not work if she was absent from work

three times a month.  R. 59.  The ALJ concluded the hearing.

## THE DECISION OF THE ALJ

The ALJ issued her decision on August 28, 2014. The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis). 20 C.F.R. §§ 404.1520, 416.920. Step 1 requires that the claimant not be currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If true, Step 2 requires the claimant to have a severe impairment. 20 C.F.R. §§ 404.1520(c), 416.920(c). If true, Step 3 requires a determination of whether the claimant is so severely impaired that he is disabled regardless of his age, education and work experience. 20 C.F.R. §§ 404.1520(d), 416.920(d). To meet this requirement at Step 3, the claimant's condition must meet or be equal to one of the impairments (a Listing) specified in 20 C.F.R. Part 404 Subpart P, Appendix 1 (Listings). 20 C.F.R. §§ 404.1520(d), 416.920(d). If the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to his prior work considering his age, education, work experience, and Residual Functional Capacity (RFC). 20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f). If the claimant cannot return to his prior work, then Step 5 requires a determination of whether the claimant is disabled considering his RFC, age, education, and past work experience. 20 C.F.R. §§ 404.1520(g),

404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  20 C.F.R. §§ 404.1512, 404.1560(c); <u>Weatherbee v. Astrue</u>, 649 F.3d 565, 569 (7th Cir. 2011); <u>Briscoe ex rel. Taylor v. Barnhart</u>, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ found that Grabill met her burden at Steps 1 and 2 of the Analysis.  She had not engaged in substantial gainful activity and she suffered from the severe impairments of degenerative disc disease, facet arthritis, chronic venous insufficiency of the bilateral lower extremities, COPD, and obesity.  R. 14.  The ALJ determined at Step 3 that Grabill's impairments or combination of impairments did not meet or equal a Listing. R. 15-16.

At Step 4, the ALJ determined that prior to April 1, 2014, Grabill had the RFC to perform light work with the following additional limitations:

> [S]he could lift 20 pounds occasionally and 10 pounds frequently, stand and walk 6 hours, and sit 2 hours in an 8-hour workday with normal work breaks.  She could not tolerate concentrated exposure to temperature extremes, humidity, fumes, odors, gases, and poor ventilation.

R. 16.  The ALJ determined that on and after April 1, 2014, Grabill had the

RFC to perform sedentary work with the following additional limitations:

> [S]he can lift 10 pounds frequently and occasionally, stand and
> walk 2 hours, and sit 6 hours in an 8-hour workday. She can
> only sit 20 minutes at a time before needing to stand for 5
> minutes at a time. She cannot have concentrated exposure to
> temperature extremes, humidity, fumes, odors, gases, and poor
> ventilation. She would need two extra work breaks per workday
> lasting one hour at a time to rest.

R. 19, 21.  The ALJ explained why she determined that Grabill's RFC

changed on April 1, 2014:

> In reaching this conclusion, the undersigned finds that
> beginning on April 1, 2014, the claimant's allegations regarding
> her symptoms and limitations are generally credible.  By April
> 2014, the claimant presented to Dr. Degreve with wheezing
> from across the room with diffuse wheezing and basilar rales.
> A repeat pulmonary function test showed moderate obstruction
> with a FEV1 of 1.53 and FVC of 2.31, unimproved with
> bronchodilators, as well as mildly impaired diffusion capacity,
> but improved an FVC compared to her prior 2012 test.  Later
> that month, Dr. Degreve observed normal respiration and
> breath sounds, 2+ deep tendon reflexes, normal sensory exam,
> normal motor exam, and a negative straight leg raise, but a BMI
> of 45.97, bilateral lumbar muscle spasms, and restricted lumbar
> range of motion secondary to pain.  The undersigned further
> notes that from November 2013 to April 2014, the claimant
> complained of no pain relief from her medications, including
> Gabapentin, cyclobenzaprine, amitriptyline, Flexeril, NSAIDs,
> muscle relaxers, and Tylenol, which tends to support a finding
> of worsened symptoms as of the established onset date. Due to
> the claimant's testimony that she experiences bad days due to
> her pain and requires daily naps, the undersigned finds that she
> is restricted to sedentary work with a sit/stand option and
> requires two extra work breaks per workday lasting one hour at
> a time.

> Moderate weight is given to the results from the claimant's April 2014 pulmonary function test, which continued to show moderate obstruction. This is consistent with the claimant's exams as of the established onset date.

R. 21 (internal citations to the record omitted). The ALJ determined at Step 4 that Grabill could not perform her prior relevant work. R. 21. The ALJ determined at Step 5 that Grabill could perform a significant number of jobs in the national economy prior to April 1, 2014, but could not thereafter when her RFC changed. The ALJ relied on the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2 (Guidelines), and the opinions of vocational expert Hollander that a person with Grabill's age, education, experience, and RFC prior to April 1, 2014, could perform the information clerk, counter clerk, and storage facility rental clerk jobs. R. 22.

The ALJ concluded Grabill was disabled beginning April 1, 2014 (the Onset Date), but not before that date. R. 23. Grabill's Date Last Insured was December 31, 2013. The ALJ, therefore, found that Grabill did not qualify for DIB, but was disabled for purposes of SSI benefits.

Grabill appealed the decision on the ALJ. On February 11, 2016, the Appeals Council denied Grabill's request for review. The ALJ's decision then became the final decision of the Commissioner. R. 1. Grabill then brought this action for judicial review.

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).  This Court must accept the findings if they are supported by substantial evidence, and may not substitute its judgment.  Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  The ALJ must articulate at least minimally her analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).  The ALJ must "build an accurate and logical bridge from the evidence to his conclusion."  Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

Grabill raises one issue on appeal. Grabill asserts that the ALJ erred in finding that her Onset Date was April 1, 2014 rather than before December 31, 2013 because: (1) the ALJ did not follow the required analysis and (2) the selection of April 1, 2014 as the Onset Date was not supported by substantial evidence.  The Court finds no error on either count.

The Social Security Administration set forth the process for determining a claimant's Onset Date in Social Security Ruling 83-20 (SSR

83-20).  See Brisco ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).  The Onset Date "is the first day an individual is disabled as defined in the Act and the regulations." SSR 83-20, 1983 WL 31249 at *1.  In cases like this one with slowly progressive impairments, the ALJ must consider Grabill's alleged Onset Date, her work history, and medical and other evidence:

> In determining the date of onset of disability, the date alleged by the individual should be used if it is consistent with all the evidence available. When the medical or work evidence is not consistent with the allegation, additional development may be needed to reconcile the discrepancy. However, the established onset date must be fixed based on the facts and can never be inconsistent with the medical evidence of record.

SSR 83-20, 1983 WL 31249 at *3.

The ALJ followed the process required by SSR 83-20.  Grabill alleged that her Onset Date was January 15, 2012, the date she stopped working. The ALJ found that this alleged Onset Date was not supported by the evidence.  The ALJ considered the medical evidence, Grabill's testimony and Function Report-Adult forms, as well as other evidence in the file.

The ALJ reasoned that Grabill's condition progressed to a point that she became disabled on April 1, 2014.  The ALJ identified three factors: (1) Grabill continued to have moderate obstruction of her breathing demonstrated by the second April 2014 pulmonary function test; (2)

beginning in November 2013 Grabill complained that her pain medication was not effective; and (3) Grabill's April 2014 physical exam showed that she had an increased BMI of 45.97, lumbar muscle spasms, and restricted lumbar range of motion secondary to pain. The ALJ concluded that this evidence supported the conclusion that her RFC diminished to the point that she could not work without two hour-long breaks. Vocational expert Hollander opined that such a person could not work. The ALJ followed the process required by SSR 83-20; she identified the Onset Date where the medical evidence and the other evidence supported the conclusion that Grabill's impairments progressed to the point that she could not work. There was no error in failing to follow SSR 83-20.

The ALJ's conclusion was also supported by substantial evidence. The ALJ's RFC determination was supported by the opinions of Drs. Gotway and Smith; the x-rays that showed a successful surgery on her neck and only minimal degenerative changes elsewhere; the normal nerve conduction/EMG study; the numerous examinations that showed normal range of motion, normal sensation, normal strength, and negative straight leg testing; as well as the Function Reports that showed a somewhat higher level of activity in 2012 and 2013. The April 2014 exam showed reduced range of motion and muscle spasms, as well as a continuingly

increasing BMI. This exam showed an additional functional limitation that supported the ALJ's conclusion that Grabill's functional abilities had deteriorated by that point to a level that required a change in her RFC.

Grabill asks the Court to reweigh the evidence. The Court cannot reweigh evidence. <u>Clifford v. Apfel</u>, 227 F.3d at 869. The Court can only decide whether the record contains "such relevant evidence as a reasonable mind might accept as adequate" to support the ALJ's decision. <u>Richardson v. Perales</u>, 402 U.S. at 401. A reasonable mind might accept as adequate the evidence on which the ALJ relied.

Grabill argues that the April 2014 pulmonary function test does not support setting the Onset Date as April 1, 2014 because the test showed no material change from the 2012 test. The test by itself would not support a finding that the Onset Date occurred in April 2014. The two pulmonary function tests are comparable. The ALJ, however, did not rely on the pulmonary function test alone. The ALJ also considered the fact that the pain medication stopped being effective beginning in November 2013 and the fact that by April 2014 the increased pain caused a limitation in Grabill's lumbar range of motion. The ALJ also considered the new symptom of muscle spasms in April 2014. The ALJ concluded that the continuing moderate obstruction in breathing, combined with the pain medication's

lack of efficacy, the functional change in Grabill's range of motion, and the muscle spasms established that Grabill's impairments had progressed to the point of disability. The ALJ did not rely solely on the pulmonary function test.

Grabill accuses the ALJ of intentionally picking the April 2014 Onset Date to deny Grabill DIB benefits. Grabill presents no evidence to support this. The Court sees no evidence of bias or improper motive in the record.

THEREFORE Defendant Commissioner's Motion for Summary Affirmance (d/e 15) is ALLOWED, Plaintiff Grabill's Brief in Support of Motion for Summary Judgment (d/e 12) is DENIED. The decision of the Commissioner is AFFIRMED. THIS CASE IS CLOSED.

ENTER:   September 19, 2017

_____ s/ Tom Schanzle-Haskins _____
UNITED STATES MAGISTRATE JUDGE